The People of the State of New York, Respondent, v. The North River Sugar Refining Company, Appellant.

*It seems* where the State seeks by action to destroy the life of a corporation it must show some grave misconduct on the part of the latter; some sin against the law of its being, not merely formal or incidental or affecting only private interests, but material and serious, and which has produced or tends to produce injury to the public.

When, however, the transgression affects the welfare of the people, they may by action summon the offender to answer for the abuse of its franchise, and ask to have its charter forfeited, and the corporation dissolved. (Code Civ. Pro. § 1798.)

While the statute confers upon trustees or directors of a manufacturing corporation general authority to manage its stock, property and concerns,

and as between the company and those with whom it deals, the corporate action must be manifested through and by the directors, there may be actual corporate conduct which is not formal corporate action; and where that conduct is directed or produced by the whole body, both the officers and stockholders of the corporation, it is of a corporate character, and if illegal and injurious justifies the penalty of dissolution.

As between the State and the corporation the substantial inquiry is what the collective action and agency of the officers and stockholders has accomplished.

It is a violation of law for a manufacturing corporation to enter into a partnership.

A consolidation of such corporations save in the manner and as provided by statute (Chap. 960, Laws of 1867; chap. 367, Laws of 1884), and whether made directly, or indirectly through the medium of a trust, is unlawful and injurious to the public interests.

*It seems* that, as corporate grants are always assumed to have been made for the public benefit, any conduct which destroys their functions, maims and cripples their separate activity, and takes away free and independent action, affects unfavorably the public interests.

In an action brought by the attorney-general in the name of the People against the defendant, a corporation organized under the General Manufacturing Act (Chap. 40, Laws of 1848), to vacate its charter and annul its corporate existence, it appeared that at a meeting of defendant's stockholders, held April 22, 1887, at which all of its trustees were present, a preamble and resolutions were adopted by a unanimous vote. The preamble recited that it was contemplated by the sugar refineries in the city of New York to consolidate in one large concern and company, and that it was for defendant's interest to participate in the consolidation. By the resolutions a committee named were appointed to perfect the consolidation, with full power to act, and defendant's president and secretary were authorized "to sign all contracts, agreements and papers which the above-named committee may make in relation to said consolidation." An agreement was thereupon made by and between various corporations engaged in the sugar refining business. To this agreement the name of defendant was signed by its secretary as he testified "by virtue of authority   *   *   * from the stockholders and trustees." *Held,* that the official signature was but the evidence of the agreement entered into by the committee, the authorized agency; and that the making of the agreement was a deliberate corporate act.

By the agreement or "Deed," as it was termed, so executed, a "Board," so called, was formed. The parties agreed to transfer all their shares of capital stock "to the names of the board as trustees, to be held by them and their successors as members of the board strictly as joint tenants," which board, it was declared "shall hold the stock transferred to it with all the rights and powers incident to stockholders in the

several corporations." The board was authorized to transfer ". to such
persons as it may be desired to constitute trustees or directors or other
officers of corporations, so many of the shares as may be necessary for
that purpose." In lieu of the capital stock it was provided that certifi-
cates should be issued by the board to the contracting parties in specified
proportions. It was provided that each of the parties should maintain
a separate organization and carry on and conduct its own business, pay-
ing over the profits to the board, "the aggregate or such amount as
shall be designated for dividends," to be proportionally distributed by
the board to the holders of the certificates. The board was prohibited
from taking any action "which shall create liability by it or by its mem-
bers," but it was provided that the funds necessary to enable the board
to make payments as specified "may be raised by mortgage to be made
by the corporations or any, either or all of them upon their property."
The number and amount of shares to be issued by the board was fixed,
with a proviso that they "may from time to time be increased or dimin-
ished by deeds executed by a majority in value of the certificate holders."
Defendant's stock was transferred and certificates issued to its stockhold-
ers as provided for. The board elected defendant's officers and board of
trustees, having transferred to each a share of the stock to enable him to
hold the office. *Held,* that the transaction was not an absolute sale of
defendant's stock by its holders; but that a trust was created in the
board, to whom as trustee and upon the trusts declared the stock was
transferred; that the certificates issued were formal declarations of the
trust, and through the operation of which the stockholders retained
the beneficial ownership; that by the deed the corporations parties
thereto entered into a copartnership, vesting the partnership power in
the board.

By the terms of the trust deed it took effect October 1, 1887. At a meeting
of defendant's stockholders held November 4, 1887, a preamble and reso-
lution were adopted, by which, after referring to the former action,
alleging that the committee so appointed had failed to make or sign
contracts, and that the powers conferred upon the committee and the
president and secretary had not been executed, it was resolved that the
powers so conferred be revoked. At a subsequent meeting held Novem-
ber twenty-fifth, a preamble and resolution were adopted, by which,
after reciting the fact of the signature of the trust deed by the secretary,
"under the belief that he was authorized so to do," and that one S. had
offered to purchase defendant's stock for $325,000, a committee was
appointed consisting of the same persons who had been authorized to
make the consolidation agreement, to deliver the stock to S., or to those
persons named as trustees, on receipt of the sum offered, the proceeds to
be divided among the stockholders. The stock was transferred on
defendant's books and delivered to S., who delivered it to the board,
receiving in exchange a certificate for $700,000, less fifteen per cent as
provided for in the deed. S. was a member of the board; he was elected

defendant's president, and other members were elected trustees. Defendant's share of the regular dividends was allotted to it for the certificate holders and it wholly ceased to refine sugar. *Held,* that there was corporate action in making the combination agreement which bound defendant and was not revoked by the subsequent proceedings; that such action was in excess of its corporate powers, illegal, and tended to the public injury, and so authorized a dissolution of the corporation.

(Argued April 22, 1890; decided June 24, 1890.)

Appeal from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made November 7, 1889, which affirmed a judgment in favor of plaintiff entered upon a verdict directed by the trial court, and affirmed an order denying a motion for a new trial.

This action was brought by the attorney-general to have the defendant " dissolved, its charter vacated and its corporate existence annulled."

The complaint alleged, and it was found, that defendant is a corporation organized under the General Manufacturing Act; that it, together with other corporations and firms, in violation of law and in abuse of its powers became a party to and carried out an agreement which was set forth as follows:

## " DEED.

### " The Sugar Refineries Company.

" The undersigned, namely: Havemeyers & Elder, The Decastro & Donner Sugar Refining Company, F. O. Matthiessen and Weichers Sugar Refining Company, Havemeyer Sugar Refining Company, Brooklyn Sugar Refining Company, the firm of Dick & Meyer, the firm of Moller, Sierck & Co., North River Sugar Refining Company, the firm of Oxnard Brothers, The Standard Sugar Refinery, The Bay State Sugar Refinery, The Boston Sugar Refining Company, The Continental Sugar Refinery and The Revere Sugar Refinery, for the purpose of forming the board hereinafter provided for, and for the other purposes hereinafter set forth, enter into the following agreement:

Sickels — Vol. LXXVI.          74

## " NAME.

" The board herein provided for shall be designated by the name of The Sugar Refineries Company.

## " OBJECTS.

" The objects of this agreement are :

" (1) To promote economy of administration and to reduce the cost of refining, thus enabling the price of sugar to bo kept as low as is consistent with reasonable profit. .

" (2) To give to each refinery the benefit of all appliances and processes known or used by the others, and useful to improve the quality and diminish the cost of refined sugar.

" (3) To furnish protection against unlawful combinations of labor.

" (4) To protect against inducements to lower the standard of refined sugars.

" (5) Generally to promote the interests of the parties hereto in all lawful and suitable ways.

## " BOARD.

" The parties hereto who are not corporations shall become such before this deed takes effect.

" Each corporation subscribing hereto agrees, and the parties hereto who are not corporations agree as to the corporations which they are to form, that all the shares of the capital stock of all such corporations shall be transferred to a board, consisting of eleven persons, which may be increased to thirteen by vote of a majority of the members of the entire board, and two additional members to belong respectively to the first and second classes hereinafter provided for.

" Any member of the board may be removed by vote of two-thirds of the members of the entire board in case of incapacity or neglect or refusal to serve.

" Any member may resign by filing written notice of his resignation with the secretary of said board.

" Vacancies during the term of office of members shall be filled by appointment by vote of the majority of the members of the entire board.

" A member appointed to fill a vacancy shall hold office until the expiration of the term of the member in whose place he is appointed, which new appointee shall succeed to all the rights, duties and obligations of his predecessor under this deed.

" Vacancies by expiration of office shall be filled at the annual meeting of the holders of certificates herein provided for, or at such other times as shall be prescribed by the board.

" Such annual meetings shall be held in the city of New York, in the month of June, and notice shall be given to each certificate holder of record of every meeting of certificate holders, by mailing to him, at least seven days before said meeting, a notice of the time, place and objects of such meeting. Holders of certificates shall vote according to the number of shares for which they hold certificates. They may vote by proxy.

" The board may make by-laws. All arrangements for meetings, elections and all details not herein specifically provided for, shall be made by the board. A member of the board may act by proxy for any other member with like effect as if he were present and acting.

" A majority of the members of the board shall constitute a quorum for the transaction of business. The action of the board meeting, by a majority vote of such meeting, shall have the same effect as the unanimous action of the board, except as herein otherwise provided, and that to authorize the appropriation of money, bonds or shares shall require the assent, either written or expressed, by vote at a board meeting, of at least a majority of the members of the entire board.

" No member of the board, shall, during the time that he holds office, buy or sell sugar or be interested directly or indirectly in the purchase or sale of sugar, whether for the purpose of speculation or otherwise, without a vote of a majority of the members of the entire board. For any violation of this provision he may be removed as a member of the board, and shall be liable to account for all profits which shall be realized by him to the board for the *pro rata* benefit of the certificate holders.

" As it is desirable that the board shall consist of members who are largely interested in the properties and the business contemplated it is hereby agreed that all members of the board shall be free to join in or become parties to agreements and transactions which the several Boards of Directors hereinafter referred to, or this board may arrange, to the same extent and in the same manner and with the like effect as if they were not members of the board.

" This board may transfer, from time to time, to such persons as it may be desired to constitute trustees, or directors, or other officers of corporations, so many of the shares as may be necessary for that purpose, to be held by them subject to the provisions of this instrument. Such transfers may be executed by the president and treasurer of the board in behalf of and as attorneys for the board for that purpose, and to be re-transferred when so requested by the board.

" The first board shall consist of the persons hereinafter mentioned; they shall hold office as follows, and until their successors shall be elected :

" *Members of the first class.* Harry O. Havemeyer, F. O. Matthiessen, John E. Searles, Jr., Julius A. Stursberg; to hold office seven years.

" *Members of the second class.* Theodore A. Havemeyer, Joseph B. Thomas, John Jurgensen, Hector C. Havemeyer; to hold office five years.

" *Members of the third class.* Charles H. Senff, William Dick; to hold office three years.

" At the expiration of the terms of the third class, and of each successive class, their successors as members of such class shall be elected for seven years.

## " Officers.

" The board shall appoint from its members a president, vice-president and treasurer, and it shall also appoint a secretary, who may or may not be a member of the board. The board may, from time to time, create other offices, and appoint the persons to fill them. It may appoint committees. It shall

designate the duties and prescribe the powers of the several officers and committees.

## " Plans.

" The several corporations, parties to this agreement, shall maintain their separate organizations, and each shall carry on and conduct its own business.

" The capital stock of each corporation shall be transferred to the board, and in lieu of the same, certificates not exceeding $50,000,000, divided into 500,000 shares, each of $100, shall be issued by the board and distributed as hereinafter provided.

" The certificates shall be in the following form :

'No.              ].                                    [Shares.
            ' [Shares one hundred dollars each.]

### ' THE SUGAR REFINERIES COMPANY.

' This is to certify that                          is entitled to              shares of the Sugar Refineries Company.

' This certificate is issued under and subject to the provisions of a deed dated the 16th day of August, 1887.

' The shares represented by this certificate are transferable by the holder and his personal representatives in person or by attorney, upon the books of the board and not otherwise, and only upon the surrender of this certificate.

' They entitle the holder to the rights, and are subject to the provisions mentioned in the deed.

' The interest of the holder is in the proportion of the number of shares represented by this certificate to the entire number of shares outstanding. The total amount represented by outstanding certificates and the terms of the deed may be changed from time to time by a majority in interest as therein provided.

' In witness whereof, the board has caused this certificate to be signed by its president and treasurer and the seal of the board to be affixed hereto, the day of              188  .

' For value received                              , do hereby
assign, transfer and set over unto
          shares of those represented by the within certificate,
and                              do hereby constitute and appoint
          attorney irrevocable for
and in                              name and stead to transfer the said
shares upon the books kept for the purpose under the direction
of the within board.

'The assignee, by accepting this transfer, assents to the
terms of the deed referred to in the certificates as the same
shall be changed from time to time.

'Witness my hand and seal this                              day of
          188 .'

## "TITLE.

"The shares of the capital stock of the several corporations
to be transferred to the board as herein provided shall be
transferred to the names of the board as trustees, to be held
by them and by their successors as members of the board
strictly as joint tenants.

"By the death, resignation or removal of any member of
the board, the whole title shall remain in the others.  All
members ceasing to be such shall execute such instrument as
may be necessary, if any, to keep the title vested in the per-
sons who from time to time shall be members of the board.

"The board shall hold the stock transferred to it with all
the rights and powers incident to stockholders in the several
corporations, and subject only to the purposes set forth in this
deed.

## "DIVISION OF INTEREST.

"The several corporations shall be entitled to the shares in
the following proportions of the $50,000,000, viz.:

"Havemeyers & Elder.

"Decastro & Donner Sugar Refining Company.

"F. O. Matthiessen & Weicher's Sugar Refining Company.

"The Havemeyer Sugar Refining Company.

"The Brooklyn Sugar Refining Company.

"Dick & Meyer.

"Moller, Sierck & Co.

"Oxnard Brothers.

"North River Sugar Refining Company.

"Standard Sugar Refinery.

"Boston Sugar Refining Company.

"Bay State Sugar Refinery.

"Continental Sugar Refinery.

"Revere Sugar Refinery.

"Each refinery and the corporation to which it belongs shall be freed from liability and indebtedness by the parties interested in it; or such parties, if the board shall approve, may provide in cash for such indebtedness or liability, leaving the same to stand at the pleasure of the board, except that the employes' contracts shown in the schedules hereto annexed, and the contracts with Havemeyers & Elder and the F. O. Matthiessen & Weichers Sugar Refining Company, and the Bay State Sugar Refinery pending for improvements and enlargements shall continue as liabilities.

"Annexed hereto are schedules in general terms of the properties of the several refineries. The properties are guaranteed to correspond with the schedule by the parties interested therein, who are to make good any deficiency. On the complete execution of this agreement each of the said parties shall make a full inventory of the property not embraced in such schedules, and useful for the conduct of the business, on hand or contracted for, including raw and refined sugars, molasses, sugars in process, syrups, bone-black, fuel, barrels, packages, charcoal and other supplies; and such inventory is to be examined, and the articles appraised at their present cash value (except as to sugar and molasses to arrive, which are to be appraised at their market value on arrival) by a committee of five persons, as follows:

"Theodore A. Havemeyer.

"F. O. Matthiessen.

"Julius A. Stursberg.

"John E. Searles, Jr.

"Joseph B. Thomas.

" The value of such property as fixed by four-fifths of the appraisers shall be paid for in cash by the said board to the treasurer of each corporation.

"Bone-black may at the option of the board be paid for in cash or in bonds hereinafter provided for or in certificates at a rate for bonds or certificates to be fixed by vote of a majority of the members of the entire board.

" The property shall remain with the refinery where it is to be used by it, except as such refinery shall make a different disposition of it.

" In consideration of the transfer of their stock to the board, the board shall also pay to Havemeyers & Elder the sum of                to the F. O. Matthiessen and Weichers Sugar Refining Company, the sum of                    and to the Bay State Sugar Refining Company the sum of                on account of payments already made on pending contracts for improvements and enlargements.

" Additional shares to the amount of $400,000, less 15 per cent. to be left with the board as hereinafter provided, shall be received by Moller, Sierck & Co. for improvements and enlargement of capacity of their refinery now in progress, when said improvements are completed and the increased capacity demonstrated.

" The shares assigned to the several refineries shall be distributed by them to and among the parties interested therein.

" Each holder of stock in a refinery company shall be entitled to so many of the shares allotted to such refinery as shall be in proportion of his stock to the capital of his company.

" Shares for stockholders of any refining company who shall not surrender their stock, may, under the direction of the board, be deposited for their account, with the right to receive the same upon the surrender of their stock.

"Of the shares allotted to the several refineries they shall leave 15 per cent. with the board, and these shares and any shares not allotted of the $50,000,000, except as herein otherwise provided, shall be subject to be disposed of by the board

either for the acquisition of other refineries to become parties to this deed, payment for additional capacity, or by appropriations to the several refineries.

" But in no case shall any appropriation be made to or any action taken by any corporation without the approval of its Board of Directors, and no action be taken by the board which shall create liability by it or by its members. ·

" PROFITS.

" The profits arising from the business of each corporation shall be paid over by it to the board hereby created, and the aggregate of said profits, or such amount as may be designated for dividends, shall be proportionately distributed by said board, at such times as it may determine, to the holders of the certificates issued by said board for capital stock, as hereinbefore provided.

" FISCAL ARRANGEMENTS.

" The funds necessary to enable the said board to make the payments herein provided to be made by it may be raised by mortgage to be made by the corporations, or either, any, or all of them, on their property, and by such other means as shall be satisfactory to such board.

" In case any mortgage shall be laid on the property of any corporation by its directors or stockholders, the holders of certificates shall, within a time to be fixed by said board, have the right, at such uniform rates as said board shall arrange, to have the bonds, certificates, or other evidence of debt or interest in proportion to their respective holdings. Any parts which shall not be thus taken may be disposed of by said board.

" CHANGES.

" The number of shares and the total amount thereof issuable by said board may from time to time be increased or diminished by deeds executed by a majority in value of the certificate holders. •

" The provisions of this deed may from time to time be changed by deed executed by not less than a majority in interest of the certificate holders, provided no change shall

be made which shall discriminate to the disadvantage of the certificate holders as between themselves.

### " Acquisition of Other Refineries.

" The capital stock of other sugar refining companies, and of companies whose business relates directly or indirectly to sugar refining (in every instance to be incorporated), may be transferred to said board with the consent of a majority thereof at valuation and upon terms satisfactory to it, to be held by said board, under and subject to all the terms of this deed, and certificates may be issued therefor by said board, and may be sold by it to provide funds for such purchase or purchases, and any such corporation or corporations shall thereupon become a party to this deed upon causing the same to be duly signed in its behalf.

### " Custody of Deed.

" This deed, when executed by the parties hereto, shall be delivered to the president of the board, who shall have the sole and independent custody and control of the same, and the said deed shall not be shown or delivered to any corporation, firm, person, or persons whatsoever, except by the express direction and order of the board.

" A copy of the said deed shall also be lodged with a member of the board residing in Boston, Mass., which shall be held by him under the same condition and in the same manner as the original deed.

" In witness whereof, the parties have hereto set their seals and affixed their names, these presents to become binding when completely executed by all the parties and to take effect from October 1, 1887.

" Dated August 16, 1887.

 " Havemeyers & Elder.

 " Donner & DeCastro Sugar Refg. Co.,

   Per H. O. Havemeyer, *Manager*. (Subject to confirmation stock and scripholders.)

 " F. O. Matthiessen & Weichers Sugar Ref. Co.,

   F. O. Matthiessen, *P.*

" HAVEMEYER SUGAR REFINING COMPANY,
JOHN E. SEARLES, JR., *Treas.*
" DICK & MEYER.
" NORTH RIVER SUGAR REFINING CO.,
GEO. H. MOLLER, *Secretary.*
" OXNARD BROS.
" MOLLER, SIERCK & CO.
" BROOKLYN SUGAR REFINING CO.,
HENRY OFFERMAN, *Treas.*
" STANDARD SUGAR REFINING CO.,
By CHARLES O. FOSTER, *Pres.*
" BAY STATE SUGAR REFG. CO.,
Per EDWIN F. ATKINS, *Pres.*
" CONTINENTAL SUGAR REFINERY,
By SILAS PIREE, *Pres.*

" The undersigned hereby agree to become parties to the foregoing deed in accordance with the terms and condition therein stated, they to receive without discount the amounts in certificates set opposite their respective signatures.
" FOREST CITY SUGAR REFINING CO.,
By H. J. LIBBY, *President.*
GEO. S. HUNT, *Treas.*
" ST. LOUIS SUGAR REFINING CO.,
By W. L. NOOTT, *President.*
A. D. CUNNINGHAM, *Sect. and Treasurer.*
" PLANTERS' SUGAR REFINING CO., New Orleans,
JOHN BARKLEY, *Prest.*
" LOUISIANA SUGAR REFINING CO.,
JOHN S. WALLIS, *President.*"

The execution of the instrument was proved. The name of the defendant was signed thereto by George H. Moller its secretary, who testified he made the signature in September, 1887, " by virtue of authority from the stockholders of the board of officers of the North River Sugar Refining Company, the stockholders and trustees."

The following records from the minute book of proceedings of defendant's board of trustees were given in evidence.

" A meeting of the stockholders of the North River Sugar Refining Company, held at the office of the refiners, corner of Water and Corlears streets, April 22d, 1887.

" Present — Peter Moller, Jr., Cord Moller, George H. Moller, Jr., John Moller, Gerd. Martens, Marx Wintjen, Charles Sherman, executor for B. B. Sherman's estate; George H. Moller, Gerh'd G. Moller.

" Peter Moller, Jr., in the chair.

" The reading of the minutes in January were dispensed with.

" Mr. George H. Moller offered the following preamble and resolution.

"Whereas, It is contemplated that the several sugar refineries in New York and other cities shall consolidate their several refineries in one large concern or company ; and

" Whereas, We deem it for the interest of the North River Sugar Refining Company to participate in the above said consolidation ; therefore be it

" *Resolved*, Peter Moller, Jr., George H. Moller and Gerd. Martens be, and they are hereby appointed a committee to make arrangements to perfect the said consolidation in behalf of the North River Sugar Refining Company with full power to act and to sign all contracts and agreements in the name of the said North River Sugar Refining Company, of whatever name or nature, concerning the said consolidation.

" Carried by a unanimous vote.

" On motion of George H. Moller it was further

" *Resolved*, That we authorize the president and secretary of the North River Sugar Refining Company to sign all contracts, agreements and papers which the above-named committee may make in relation to the said consolidation.

" All present voting in the affirmative.

" George H. Moller, *Secretary.*"

It was proved that at said meeting all of defendant's trustees were present.

" A meeting of the stockholders of the North River Sugar Refining Company held November 4, 1887.

" Present — Peter Moller, Jr., Charles Sherman, executor of B. B. Sherman's estate, Marx Wintjen, Gerd. Martens, Cord Moller, George H. Moller, Jr., Charles G. Moller and George H. Moller.

" Peter Moller, Jr., in the chair.

" The minutes of the meeting held on April 22d, 1887, were read and approved.

" The following preamble and resolution were offered by Charles G. Moller :

" WHEREAS, At a meeting of the stockholders of the North River Sugar Refining Company, held on the 22d day of April, 1887, Peter Moller, Jr., George H. Moller and Gerd. Martens, were appointed a committee to make arrangements to perfect a consolidation with the several sugar refiners of New York and other cities, with power to sign contracts in the name of the said company looking to this end ; and

" WHEREAS, The president and secretary of said company were authorized to sign all contracts and agreements which the said committe might make in relation to said consolidation ; and

" WHEREAS, The said committee has failed to make or sign such contracts, and the powers conferred upon it and upon the president and secretary have not been exercised, and it is deemed inexpedient at the present time to enter into any such consolidation as proposed ;

" *Resolved,* That the powers conferred upon the said committee and upon the president and secretary as above stated be and the same hereby are revoked, and said committee is discharged from further consideration on the subject, and the resolutions of the date above referred to, conferring such powers, hereby cancelled and annulled.

" The above resolution was carried unanimously.

　　　　　　　　　　　" GEORGE H. MOLLER,
　　　　　　　　　　　　　　" *Secretary.*"

" A meeting of the stockholders of the North River Sugar Refining Company was held at the office of the company, 92 Wall street, on the 25th day of November, 1887.    *    *    *

" The matter in relation to the North River Sugar Refining Company with the Sugar Refiners' Union was considered.

" WHEREAS, On or about the fifth day of December, 1887, George H. Moller, Secretary of the North River Sugar Refining Company, signed a deed of consolidation of the various sugar refining companies in the United States under the belief that he was authorized so to do, providing for the delivery of the stock of the company to trustees therein named, and for receiving stock of the consolidated company in return as provided in said instrument; and,

" WHEREAS, John E. Searles, Jr., has offered to purchase the capital stock of said North River Sugar Refining Company for the sum of $325,000, this consideration not to include the six lots of land on the southwest corner of Corlears and Water streets, for which $25,000 has been allowed out of the consideration of $350,000, originally mentioned, the property known as No. 11 and 13 Hubert street, of books and accounts, bills receivable and all other personal property (not belonging to the Refinery) of the North River Sugar Refining Company, and the lease of the stables, and the lease of the office No. 92 Wall street, except office furniture and safes at the refinery,

"*Resolved*, That Peter Moller, Jr., George H. Moller and Gerd. Martens be, and they are, appointed a committee to deliver the said stock to John E. Searles, Jr., or, at his request, to John E. Parsons, John R. Dos Passos and Franklin Bartlett, trustees, on receipt of the sum of $325,000, the proceeds to be divided among the stockholders of this date according to their respective shares.

" Carried unanimously."

All of the defendant's capital stock was transferred to Mr. Searles, each stockholder indorsing his certificate in blank. The sum specified, $325,000, was paid and the proceeds divided among the stockholders. At the time of the transfer, the

works of the company were running and continued to do so until January, 1888, up to which time it was agreed they should be run to work up stock on hand. They were then turned over to Mr. Searles and were never run thereafter.

Mr. Searles testified that he was a member of the board created by the deed, and was secretary and treasurer; that, with the exception of stock held by the new board of directors, all of ·the stock was transferred to that board, which issued certificates to the amount of $595,000, that is, $700,000 less fifteen per cent reserved under the provisions of the deed. A dividend of two and a half per cent was declared by the board in April, 1888, the holders of the certificates issued in exchange for defendant's stock receiving their proportion.

Further facts are stated in the opinion.

*James C. Carter* for appellant. The omission to file the certificate required by the act of 1848 constitutes no sufficient ground for a forfeiture of the charter of the corporation. (*State* v. *C. Bank*, 10 Ohio, 535; *State* v. *F. College*, 32 Ohio St. 487; *Thompson* v. *People*, 23 Wend. 537.) The failure of the defendant corporation to carry on business for a short period was no cause for forfeiture. (*Brinkerhoff* v. *Brown*, 7 Johns. Ch. 217; *Pratt* v. *Benedict*, 17 N. Y. 79; *Kelsey* v. *P. P. Co.*, 19 Abb. [N. C.] 427.) The judgment of the Special Term, so far as it proceeds upon the ground that the defendant corporation became, by an attempted exercise of corporate power, a party to the supposed illegal deed or agreement, is plainly erroneous. It never became such party. (Manufacturing Co.'s Act, § 3; *Conro* v. *P. H. Co.*, 12 Barb. 27, 63; *Hoyt* v. *Thompson*, 19 N. Y. 207, 216; *Landers* v. *F. S. M. Church*, 114 id. 626.) It may be argued that it was at least proved that there was a combination among all the stockholders of the several companies upon the terms and for the purposes set forth in the " deed ; " and that the voting power of each corporation was absolutely subjected to the will of certain persons selected to carry out the purpose of the consolidation. All this may be, for the purpose of argument,

admitted to be true, but it is utterly insufficient to warrant the judgment. (Code Civ. Pro. § 1798 ; *Barnes* v. *Brown,* 80 N. Y. 327 ; *Havemeyer* v. *Havemeyer,* 11 J. & S. 517 ; 86 N. Y. 618 ; *Faulds* v. *Yates,* 57 Ill. 416 ; *Conro* v. *P. H. I. Co.,* 12 Barb. 27.) The plaintiff contends that an agreement was made in restraint of trade and tending to monopoly ; that it was entered into for the purpose of destroying competition and raising the price of merchandise, and was injurious to trade and commerce, contrary to public policy, and, therefore, an illegal act. It is submitted that these contentions have no color even of support, either in reason or authority. (*D. M. Co.* v. *Roeber,* 106 N. Y. 473 ; *Leslie* v. *Lorillard,* 110 id. 519 ; *Clancy* v. *S. Co.,* 62 Barb. 395 ; *M. S. S. Co.* v. *McGregor,* L. R. [15 Q. B. Div.] 476 ; 21 id. 541 ; 23 id. 598 ; *Collins* v. *Locke,* L. R. [4 App. Cas.] 674 ; *C. S. R. Co.* v. *Cushman,* 143 Mass. 353 ; *Wicken* v. *Evans,* 3 Y. & J. 318 ; *Ronsillon* v. *Ronsillon,* L. R. [14 Ch. Div.] 51 ; *Whittaker* v. *Howe,* 3 Beav. 383 ; *Jones* v. *Lee,* 1 H. & N. 189 ; *L. Co.* v. *Lorsont,* L. R. [9 Eq. Cas.] 345 ; *O. S. Co.* v. *Winsor,* 20 Wall. 64 ; *Morse* v. *Morse,* 104 Mass. 73 ; *Fowle* v. *Park,* 131 U. S. 88 ; *Hare* v. *L. R. R. Co.,* 2 J. & H. 80 ; *Skrainka* v. *Scharringhausen,* 8 Mo. App. 522 ; *Comm.* v. *Hunt,* 4 Metc. 111 ; *Snow* v. *Wheeler,* 113 Mass. 179.) It follows from the foregoing that the transaction of forming what is called the sugar trust cannot even be challenged on any ground upon which courts, since the abandonment of the doctrines condemning such practices as forestalling and regrating, have held agreements to be in restraint of trade, or competition unlawful. Those grounds have never been available, except where there was an executory agreement directly restraining trade or regulating prices. (Laws of 1876, chap. 960.)

*John E. Parsons* for appellant. Objections to combinations of capital upon the ground that they are opposed to the public interest, are at variance with the views entertained by leading political economists and by distinguished jurists who

in recent times have considered the subject. Such combinations do not prevent competition. On the contrary, if they result advantageously, they stimulate, encourage and invite it. If they could prevent competition, that is not necessarily against the public interest. Competition may be the death of trade. Combinations of capital, which means doing business on a large as against doing it on a small scale, enable producers to furnish a good article at a minimum of profit, and by reason of the scale upon which the business is done, at a remunerative return. (*Proctor* v. *Sargent*, 2 Scott [N. R.], 289; 2 M. & G. 36; *Palmer* v. *Stebbins*, 3 Pick. 188; Greenl. on Pub. Pol. 687; *D. M. Co.* v. *Roeber*, 106 N. Y. 473; *Mitchel* v. *Reynolds*, 1 P. Wms. 181; *Leslie* v. *Lorillard*, 110 N. Y. 519; *Marsh* v. *Russell*, 66 id. 288; *Skrainka* v. *Scharringhausen*, 8 Mo. App. 522; *C. S. R. Co.* v. *Cushman*, 143 Mass. 353; *M. S. Co.* v. *McGregor*, L. R. [23 Q. B. Div.] 598; *N. P. Bank* v. *Marshall*, L. R. [40 Ch. Div.] 112.) The purpose and the effect of the deed is that the holders of the stock of all the refinery corporations pool their stock, thus in effect, making all the former stockholders of each corporation stockholders of all, and so bringing about a community of property and interest. To maintain that such an arrangement is criminal requires that it shall be determined that rivals in business may not become partners, contributing to the partnership their several properties, and that neither a joint stock association nor corporation shall be created by persons previously carrying on business separately, to unite their properties and business for their common good. (*Havemeyer* v. *Havemeyer*, 11 J. & S. 517; *Barnes* v. *Brown*, 80 N. Y. 527; *Faul* v. *Yates*, 57 Ill. 416; *Falls' Appeal*, 91 Penn. St. 434; Lind. on Part. 1, § 1; Bates on Part. § 1; Laws of 1867, chap. 960; Laws of 1875, chap. 611; Laws of 1849, chap. 258.) If it be legal for stockholders in several corporations to pool their stock, for them to do so cannot cause a forfeiture of the charters of the companies. (Cook on Stock & Stockholders, §§ 622, 625; *Conro* v. *P. H. I. Co.*, 12 Barb. 27; *McCul*

*lough* v. *Moss*, 5 Den. 567 ; *Cammeyer* v. *U. Churches*, 2 Sandf. Ch. 186.)   It was error to deny the defendant's application to fix an amount in which it might give an undertaking to stay proceedings upon appeal.   (Code Civ. Pro. §§ 1328, 1329 ; *Ins. Co.* v. *Ward*, 20 Wend. 588.)

*Charles F. Tabor*, Attorney-General, and *Roger A. Pryor* for respondent.   The judgment is vitiated by no technical error.   (*Dillon* v. *Cockroft*, 90 N. Y. 649 ; *Provost* v. *McEnroe*, 102 id. 650; *Ormes* v. *Dauchy*, 82 id. 443 ; *Trustees, etc.*, v. *Kirk*, 68 id. 439, 464; *Stratford* v. *Jones*, 97 id. 589 ; *Appleby* v. *Ins. Co.*, 54 id. 260 ; *People* v. *Cooke*, 8 id. 67 ; *Lomer* v. *Meeker*, 25 id. 361; *Dwight* v. *Ins. Co.*, 103 id. 341, 359 ; *Kelly* v. *Burroughs*, 102 id. 93 ; *Leggett* v. *Hyde*, 58 id. 275; *Wolf* v. *L. Ins. Co.*, 43 Barb. 405 ; 41 N. Y. 620 ; *Nichols* v. *Martin*, 35 Hun, 168; *Koehler* v. *Adler*, 78 N. Y. 287;  *Cady* v. *Bradshaw*, 116 id. 198.)   On the merits the validity of the judgment is unimpeachable, the unchallenged evidence exhibiting a clear case for the forfeiture of defendant's charter.   (Field on Corp. § 6; *Trustees, etc.*, v. *Woodward*, 4 Wheat. 518, 637; 2 Waterman on Corp. § 431 ; *Leslie* v. *Lorillard*, 110 N. Y. 531.)   Corporate franchises are granted in trust, and upon condition, in trust, on the one hand, that they be exerted to the attainment of the object for which they are conceded, and, on the other, that they be not abused to the public detriment, upon the condition that for nonuser or misuser they may be reclaimed by the state in the appropriate judicial proceeding.   (*People* v. *W. T. & B. Co.*, 47 N. Y. 586, 592; *Smith's Case*, 4 Modern, 58 ; 2 Black. Comm. 153 ; *City of London* v. *Vanacker*, 1 Ld. Raym. 499 ; *E. L., etc., Co.'s Appeal*, 122 Penn. St. 154; *People* v. *F., etc., Co.*, 27 Barb. 445 ; *Slee* v. *Bloom*, 5 Johns. Ch. 366, 379, 380 ; *Ward* v. *Farwell*, 97 Ill. 593 ; *Terrett* v. *Taylor*, 9 Cranch. 52 ; 2 Kent's Comm. 312 ; *Com.* v. *Bank*, 21 Pick. 542 ; Angell & Ames on Corp. § 774; *Ins. Co.* v. *Needles*, 113 U. S. 574; 2 Waterman on Corp. § 427 ; *R. R. Co.* v. *K. Co.*, 113 U. S. 384.)   Any act of a corporation, in violation

of law and to the public detriment, forfeits its franchises.
(*State* v. *R. R. Co.*, 45 Wis. 590; *C. & O. R. R. Co.* v. *B.
& O. R. R. Co.*, 4 G. & J. 121; *People* v. *F., etc., R. R. Co.*,
27 Barb. 452; *Thompson* v. *People*, 23 Wend. 581.) Acts
and contracts *ultra vires* the corporate authority are illegal;
and where prejudicial to the public interests are grounds of
forfeiture of the corporate franchise. (*Head* v. *P. Co.*, 2
Cranch. 169; *U. S.* v. *Arredondo*, 6 Pet. 736; *N. Bank* v.
*Jones*, 95 N. Y. 121; *F. Co.* v. *Hyde Park*, 97 U. S. 666;
*Morris* v. *R. R. Co.*, 20 N. J. Eq. 542; *N. Bank* v. *Mat-
thews*, 98 U. S. 621; Taylor on Corp. § 457; 2 Morawetz on
Corp. § 1024; *People* v. *Trustees*, 5 Wend. 211; *Southern* v.
*Lanier*, 5 Fla. 100; *Bissell* v. *R. R. Co.*, 22 N. Y. 285;
*Thomas* v. *City*, 12 Wall. 356; Code Civ. Pro. § 1798;
*People* v. *O'Brien*, 111 N. Y. 1; *People* v. *Bristol*, 23 Wend.
222; *State* v. *R. R. Co.*, 45 Wis. 589; *People* v. *Palmer*,
109 N. Y. 110.) The rule that an illegal or unauthorized act
is sufficient ground of corporate forfeiture is abundantly
illustrated by adjudicated cases. (*King* v. *Mayor, etc.*, 8 How.
St. Tr. 1078; *People* v. *G. College*, 5 Wend. 211; *State* v.
*Bank*, 33 Miss. 474; *State* v. *R. R. Co.*, 45 Wis. 580; *Atty.-
Gen.* v. *R. R. Co.*, 6 Ired. 469; *People* v. *U. Ins. Co.*, 15 Johns.
358; *P. Co.* v. *S. T., etc., R. R. Co.*, 118 U. S. 290; *People*
v. *R. R. Co.*, 24 N. Y. 261; *In re McGraw*, 111 id. 111; 2
Kyd on Corp. 479; Angell & Ames on Corp. §§ 774–776; 2
Waterman on Corp. § 427; Green's Brice's Ultra Vires, 787;
*People* v. *Bristol*, 23 Wend. 233–250; *State* v. *R. R. Co.*, 8
Am. Rep. 188–190.) Agreements tending to monopoly, *i. e.*,
"any combination among merchants to raise the price of
merchandise, to the detriment of the public," are illegal.
(Bouvier's Law Dict., "Monopoly;" *People* v. *A. S. R. Co.*,
7 R. & C. Law Jour. 83; *Richardson* v. *Buhl*, Id. 89; *People*
v. *C. G. Trust*, 41 Alb. L. J. 68; *Anderson* v. *Jett*, Id. 103;
*Leonard* v. *Poole*, 114 N. Y. 371; *Arnot* v. *Coal Co.*, 68 id.
559; *Stanton* v. *Allen*, 5 Den. 434; *Clancy* v. *S. Co.*, 62
Barb. 395; *Hooker* v. *Vanderwater*, 4 Den. 349; *T. & P.
R. Co.* v. *S. P. R. Co.*, 6 South. Rep. 888, 891; *People* v.

*Fisher*, 14 Wend. 9–19; *Colles* v. *T. Co.*, 11 Hun, 397; *Watson* v. *The Companies*, 52 How. Pr. 348; *C. Co.* v. *C. Co.*, 68 Penn. St. 182; *S. Co.* v. *Guthrie*, 35 Ohio St. 672; *Croft* v. *McConoughy*, 79 Ill. 339; *Santa Clara* v. *Hayes*, 76 Cal. 387; 9 Am. Rep. 211; *Bank* v. *King*, 44 N. Y. 87; *Case of Monopolies*, 11 Coke, 84; *Raymond* v. *Leavitt*, 46 Mich. 447; *I. B. Co.* v. *Koch*, 14 La. Ann. 168; *Ray* v. *Mackin*, 100 Ill. 246; *People* v. *Stephens*, 71 N. Y. 545; *Marsh* v. *Russell*, 66 id. 288; *H., etc., Co.* v. *R. R. Co.*, 3 Robt. 411; *Hilton* v. *Eckersley*, 6 Ell. & Bl. 47; *Central, etc.,* v. *Collins*, 40 Ga. 582; *Hoffman* v. *Brooks*, 11 Wkly. Law Bull. 258.) The combination created by the "Sugar Refineries Company" deed being injurious to trade and commerce, is a criminal conspiracy, and an indictable offense. (*Rex* v. *DeBerenger*, 3 M. & S. 67; *Rex* v. *Hillber*, 2 Chitty, 163; *Rex* v. *Waddington*, 1 East. 143, 167; *Rex* v. *Sterling*, 1 Keble, 650; *King* v. *Norris*, 2 Kenyon, 300; *Anonymous*, 12 Modern, 248; *People* v. *Melvin*, 2 Wheeler's Cr. Cas. 262; *Com.* v. *Carlisle*, Brightly, 36; 4 Black. Comm. 158, 159; 2 Bish. Cr. Law, § 231; 1 Russ. Cr. Law, 168; 3 Inst. C. 89; Penal Code, § 168, subd. 6; *Leonard* v. *Poole*, 114 N. Y. 371; *Pittsburg* v. *McMillin*, 53 Hun, 67, 69; *People* v. *Fisher*, 14 Wend. 9; *M. R. Co.* v. *Barclay*, 68 Penn. St. 174; *Hooker* v. *Vanderwater*, 4 Den. 348; *Clancy* v. *Salt Co.*, 62 Barb. 395; Barb. Cr. Law, 245.) The character of the combination, whether tending to monopoly and injurious to the public, will be determined by the provisions of the instrument constituting it, without reference to its effects in actual operation. (*Richardson* v. *Crandall*, 48 N. Y. 348; *Hooker* v. *Vanderwater*, 4 Den. 352; *Stanton* v. *Allen*, 5 id. 440; *In re Jacobs*, 98 N. Y. 110; *Mugler* v. *Kansas*, 123 U. S. 661; *Fisher* v. *Bush*, 35 Hun, 643; *Harrington* v. *Victoria, etc., Co.*, 28 Moak's Eng. R. 453.) The trust agreement tends to the suppression of competition and the enhancement of prices, and constitutes a strict monopoly. (*Lawrence* v. *Kidder*, 10 Barb. 642; *Dunlop* v. *Gregory*, 10 N. Y. 244.) The case is not similar to the pooling arrangements between railroad carriers (which, however, are illegal), for there

the evil of monopoly is checked by the power of the state to regulate prices. (*Munn* v. *Illinois*, 94 U. S. 113; *R. R. Commission Cases*, 116 id. 307; *Dow* v. *Biedelman*, 125 id. 680; *People* v. *R. R. Co.*, 70 N. Y. 569.) Any combination to do an act injurious to trade or commerce is a criminal conspiracy. (Penal Code, § 168, subd. 6; *Leonard* v. *Poole*, 114 N. Y. 371; *Hooker* v. *Vanderwater*, 4 Den. 353; *People* v. *Fisher*, 14 Wend. 19; *Mitchell* v. *Reynolds*, 1 P. Wms. 181; *Clancy* v. *S. Co.*, 62 Barb. 395; *E. Fund* v. *Sutchwell*, 71 N. C. 111; 8 Am. Rep. 192; *Richardson* v. *Buhl*, 7 R. R. & Corp. L. J. 89; *People* v. *C. G. Trust*, 41 Alb. L. J. 68.) It is no answer to the criticism of the sugar "combine" to say, that a man may do what he pleases with his own, that the stock in the several companies is the property of the shareholders, and that they may dispose of it at their pleasure. (*Coates* v. *Mayor, etc.*, 7 Cow. 585.) The scheme of combination constituted by the Sugar Refineries Company deed creates a monopoly in the strictest and most absolute sense, *i. e.*, a single seller. (*State* v. *Krebs*, 64 N. C. 604; Code Civ. Pro. § 1798, subd. 2.) Defendant corporation is party to the Sugar Refineries Company deed. (*S. Co.* v. *E. Co.*, 90 N. Y. 607; *President, etc.*, v. *R. R. Co.*, 7 Lans. 240.) To the argument that since appellant had no legal power to enter the combination, in contemplation of law it has not entered the combination, the Court of Appeals furnishes a conclusive answer. (*In re McGraw*, 111 N. Y. 106.) Defendant corporation was carried into the combination by the concurrent action of all the stockholders and trustees — action taken not as individuals, but as stockholders and trustees, and taken for the express purpose of placing the corporation within the grasp and control of the combination. (*Paulding* v. *Company*, 94 N. Y. 341.) On the hypothesis that by no act of its trustees, as such, was defendant introduced into the combination, we answer that in quo warranto to dissolve a corporation, it is the misconduct of the corporators that operates a forfeiture of the corporate franchise. (2 Kyd on Corp. 475; Ayliffe on Civ. Law, 196; 1 Morawitz on Corp. §§ 1, 227, 474;

*People* v. *Bd. Assessors,* 1 Hill, 620 ; *McKinley* v. *Wheeler,* 130 U. S. 633 ; 1 Waterman on Corp. § 5 ; *Pembina* v. *Pennsylvania,* 125 U. S. 189 ; 2 Morawitz on Corp. § 652 ; Taylor on Corp. § 50 ; *Sanger* v. *Upton,* 91 U. S. 59 ; *Bissell* v. *R. R. Co.,* 22 N. Y. 259 ; Cook on Stock. § 209 ; *Louisville* v. *Letson,* 2 How. [U. S.] 497.) The corporate franchises vest, not in corporations, but in corporators. (*Paul* v. *Virginia,* 8 Wall. 181 ; 3 Kent's Comm. 458 ; *People* v. *Utica,* 15 Johns. 387 ; *B. Bridge Case,* 3 Wall. 51, 73 ; *W. R. R. Co.* v. *Reid,* 13 id. 266 ; *D. R. R. Co. Tax Case,* 18 id. 225 ; *Erie, etc., R. R. Co.* v. *Casey,* 26 Penn. St. 287.) It results, therefore, obviously and irrefragably, that since the corporate franchise vests in the corporators, and the act of incorporation constitutes a contract between them and the government, it is their act which operates a forfeiture of the franchise, and their misconduct which incurs the penalty of forfeiture of their franchise. (1 Black. Comm. 484 ; 2 Kyd on Corp. 477, 478 ; *People* v. *K., etc., R. R. Co.,* 28 Wend. 205.) Party to a combination of which the effect is obvious and inevitable, defendant will be held to intend that effect. Indeed, any other purpose of the parties to the combination than to prevent competition and enhance price is inconceivable. (*Haire* v. *Wilson,* 9 B. & C. 643 ; *Denny* v. *Danna,* 2 Cush. 160 ; *Henderson* v. *Mayor, etc.,* 92 U. S. 259.) Indisputably defendant's corporate faculties, instead of conducing to the benefit of the public are perverted to its detriment, and, consequently it has incurred a forfeiture of its franchises. (*People* v. *A. S. R. Co.,* 7 R. & C. L. Jour. 816 ; *Sir Robert Atkin's Case,* 3 Modern, 12.) Independently of the character of the combination, *i. e.,* as tending to monoply and repugnant to public policy, defendant, by joining it, did an act *ultra vires* in abuse of its powers, and in perversion of its institution ; and so incurred the statutory penalty, namely, forfeiture of its corporate franchise. (2 Bouvier's Law Dict. " Joint Stock Company ; " Laws of 1849, chap. 258 ; N. Y. Const. art. 8, § 1 ; *People* v. *Wemple,* 7 R. R. & Corp. L. Jour. 127 ; *Waterbury* v. *Company,* 50 Barb. 157 ; *L. Ins. Co.* v. *Massachusetts,*

10 Wall. 566 ; *Westcott* v. *Fargo*, 61 N. Y. 547 ; *Bank* v. *Vanderwerker*, 74 id. 234 ; 1 Waterman on Corp. § 10 ; Cook on Stock. §§ 504, 506 ; *People* v. *Beach*, 19 Hun, 260 ; *Astor* v. *A. R. Co.*, 113 N. Y. 93 ; *Beach* v. *Fulton*, 3 Wend. 573 ; *Legnard* v. *Association*, 80 N. Y. 638 ; *Milbank* v. *R. R. Co.*, 64 How. Pr. 23–25; *Rock River* v. *Sherwood*, 10 Wis. 230 ; *Abbey* v. *Billups*, 35 Miss. 618 ; *Davis* v. *Old Colony*, 131 Mass. 258 ; Pierce on Railroads, 500, note; Boone on Corp. § 43; *People* v. *C. G. Trust*, 22 Chicago Leg. News, 107 ; *Hood* v. *R. R. Co.*, 22 Conn. 1 ; *Franklin* v. *Lewiston*, 68 Me. 43.) The combination between the several corporations, resulting from the transfer of their stock to the board, " subject to the purposes set forth in this deed," if not in legal conception, is in practical effect an amalgamation or consolidation of these corporations — or, at all events, a copartnership between them. (*Pittsburg* v. *McMillin*, 53 Hun, 67, 69 ; *Champion* v. *Bostwick*, 18 Wend. 175, 183 ; *Burnett* v. *Snyder*, 81 N. Y. 555 ; *Stroker* v. *Elting*, 97 id. 102, 105 ; *N. Y. C. Co.* v. *Sharon*, 7 Wend. 412 ; *Clearwater* v. *Meredith*, 1 Wall. 25, 29 ; *Whittenton* v. *Upton*, 10 Gray, 596, 597 ; 1 Morawetz on Corp. § 376 ; Angell & Ames on Corp. § 272 ; Parsons on Part. 29 ; *M. Bank* v. *Ogden*, 29 Ill. 248; Taylor on Corp. §§ 419, 420 ; *Mallory* v. *Oil Works*, 2 Pick. 598 ; *Pierson* v. *McCurdy*, 33 Hun, 520, 522 ; *French* v. *Donahue*, 29 Minn. 111 ; *Coleman* v. *R. Co.*, 10 Beav. 1 ; *P. R. R. Co.* v. *Thorp*, 28 Mich. 506 ; *Tuttle* v. *R. R. Co.*, 35 id. 247.) Defendant corporation has forfeited its charter by the transfer of its control to " The Sugar Refineries Company." (*Gould* v. *Head*, 30 Fed. Rep. 888 ; *Richmond* v. *Vestry*, 3 Ch. Div. 82 ; *Winch* v. *Birkenhend*, 5 DeG. & Sm. 567 ; *Beman* v. *Rufford*, 6 Eng. L. & Eq. 106 ; *Hafer* v. *R. R. Co.*, 19 Abb. [N. C.] 454; *Vanderbilt* v. *Bennett*, Id. 460 ; *Thomas* v. *R. R. Co.*, 101 U. S. 83 ; *Ohio & Miss., etc., R. R. Co.*, 5 Am. Law Reg. [N. S] 733 ; *Abbott* v. *R. R. Co.*, 80 N. Y. 27.) Defendant has forfeited its charter, by procuring and permitting its management to be conducted in another interest than that of its own stockholders. (Taylor on Corp. § 558 ; *Milbank* v. *R. R. Co.*, 64 How. Pr.

29; *Pearce* v. *R. R. Co.*, 21 How. U. S. 443; *Berry* v. *Hayes*, 24 Barb. 212; *East Anglia, etc.*, v. *Ry. Co.*, 7 Eng. L. & Eq. 505.) By the transfer of defendant's stock to the Sugar Refineries Company, "subject to the purposes of this deed," the law forbidding the suspension of the absolute ownership of personal property was violated. (1 Edm. Stat. 727; *Duke of Norfolk's Case*, 1 Vern. 164; 2 Black. Com. 268; 4 Kent's Comm. 287; *Fischer* v. *Bush*, 35 Hun, 643; *In re O'Hara*, 95 N. Y. 404, 422; *Schettler* v. *Smith*, 41 id. 328; *In re McGraw*, 111 id. 106.)

Fɪɴᴄʜ, J. The judgment sought against the defendant is one of corporate death. The State, which created, asks us to destroy; and the penalty invoked represents the extreme rigor of the law. Its infliction must rest upon grave cause, and be warranted by material misconduct. The life of a corporation is indeed less than that of the humblest citizen, and yet it envelopes great accumulations of property, moves and carries in large volume the business and enterprise of the people, and may not be destroyed without clear and abundant reason. That would be true even if the legislature should debate the destruction of the corporate life by a repeal of the corporate charter; but is beyond dispute where the State summons the offender before its judicial tribunals, and submits its complaint to their judgment and review. By that process it assumes the burden of establishing the charges which it has made, and must show us warrant in the facts for the relief which it seeks.

Two of the charges preferred in the complaint have dropped out of sight. They were of little importance, and have been prudently dismissed from the inquiry for that reason; and we are left to consider the one grave and serious accusation to which alone the proofs and argument have been directed. That accusation is adequate to the purpose for which it was framed, but upon two conditions, which dictate the line of inquiry and limit the area of discussion. It appears to be settled that the State as prosecutor must show on the part of

the corporation accused some sin against the law of its being which has produced, or tends to produce, injury to the public. The transgression must not be merely formal or incidental, but material and serious; and such as to harm or menace the public welfare. For the State does not concern itself with the quarrels of private litigants. It furnishes for them sufficient courts and remedies, but intervenes as a party only where some public interest requires its action. Corporations may, and often do, exceed their authority where only private rights are affected. When these are adjusted, all mischief ends and all harm is averted. But where the transgression has a wider scope and threatens the welfare of the people, they may summon the offender to answer for the abuse of its franchise or the violation of its corporate duty. The Code of Civil Procedure authorizes an action for that purpose when the corporation has " violated any provision of law whereby it has forfeited its charter or become liable to be dissolved by the abuse of its powers." In *Thompson* v. *People* (23 Wend. 583), the ground of forfeiture was tersely described as "some misdemeanor in the trust injurious to the public;" and as recently as the case of *Leslie* v. *Lorillard* (110 N. Y. 531), we said, " In the granting of charters the legislature is presumed to have had in view the public interest; and public policy is concerned in the restriction of corporations within chartered limits; and a departure therefrom, is only deemed excusable when it cannot result in prejudice to the public."

Two questions, therefore, open before us: first, has the defendant corporation exceeded or abused its powers; and, second, does that excess or abuse threaten or harm the public welfare.

The first question requires us to ascertain what the defendant corporation has done in violation of its duty, or omitted to do in performance of its duty. We find disclosed by the proof that it has become an integral part and constituent element of a combination which possesses over it an absolute control, which has absorbed most of its corporate functions,

and dictates the extent and manner and terms of its entire business activity. Into that combination, which drew into its control sixteen other corporations engaged in the refining of sugar, the defendant has gone, in some manner and by some process, for as an unquestionable truth we find it there. All its stock has been transferred to the central association of eleven individuals denominated a " Board ; " in exchange it has taken and distributed to its own stockholders certificates of the board carrying a proportionate interest in what it describes as its capital stock; the new directors of the defendant corporation have been chosen by the board, made eligible by its gift of single shares, and liable to removal under the terms of their appointment at any moment of independent action. It has lost the power to make a dividend, and is compelled to pay over its net earnings to the master whose servant it has become. Under the orders of that master it has ceased to refine sugar, and by so much, has lessened the supply upon the market. It cannot stir unless the master approves, and yet is entitled to receive from the earnings of the other refineries, massed as profits in the treasury of the board, its proportionate share for division among its own stockholders holding the substituted certificates. In return for this advantage it has become liable to be mortgaged, not for its own corporate benefit alone, but to supply with funds the controlling board when reaching out for other and coveted refineries. No one can look these facts fairly in the face without being compelled to say that the defendant is in the combination and in to stay. Indeed, so much is with great frankness admitted on the part of the appellant. Its counsel concedes that the stock was transferred " to the board mentioned in the agreement and on the terms and for the purposes mentioned in the agreement; and that this action effectually lodged the control of the defendant company, so far as such control can be secured by the voting power, in that board."

But that truth does not alone solve the problem presented. We are yet to ascertain whether the corporation became the subordinate and servant of the board by its own voluntary

action, or the will and power of others than itself; by force
of a contract to which it was in reality a party, or as the
simple consequence of a change of owners; by its fault or its
misfortune; by a sale or by a trust. For, if it has done noth-
ing, if what has happened, and all that has happened, is ascer-
tained to be that the stockholders of the defendant, one or
many, sold absolutely to the eleven men who constituted the
board their entire stock, and the latter, by force of their pro-
prietorship and as owners, have merely chosen directors in
their own interest, and are only managing their property in
their own way as any absolute owners may; if that is the
truth, and the entire and exact truth, it is difficult to see
wherein the corporation has sinned, or what it has done
beyond merely omitting for a time to carry on its business.
That is the theory upon which the appellant stands, and which
it submits to our examination.

On the other hand it is contended that there never was a
sale, but a trust constituted by mutual agreement; that they
who agreed were the whole body of stockholders in each cor-
poration necessarily representing and binding the corporation
itself; that they transferred their shares to the board upon the
trusts declared in the deed; that the certificates issued by the
board were the formal declaration of the trust; that the cor-
porate stockholders parted with the legal title of their stock to
the chosen trustees with the power to vote upon it, but retained,
nevertheless, its beneficial ownership through the operation of
the certificates; and so the corporations entered into a part-
nership with each other, vesting the partnership power in a
board of control.

I have brought these two theories face to face where they
may confront each other, because, when a choice is made
between them, we have gone a long distance towards the end
of the controversy.

In making that choice we must necessarily analyze and con-
strue the deed or contract which formed the terms of the com-
bination, and which not only dictated its character, but brought
it into existence. That contract, on the theory of a sale, is an

unexpected and unaccountable document. A sale presumes vendors on the one side and vendees on the other, each having life and existence and the power and ability to contract. Here there was no joint stock association existing or organized until the vendors themselves created it, and they were obliged to construct their vendee in the very act of transfer. A contract of sale implies some negotiation between buyer and seller, each consulting his own interest and acting independently and of his free choice. Here there was no negotiation with the board, but the vendors having created their vendee, themselves alone dictated the terms on which they should sell and it should buy. The selling stockholder explicitly swears that the board had nothing whatever to do with fixing the price. In a contract of sale covering property valued at some fifty millions of dollars and containing a patient statement of the terms of the trade, we should naturally expect that at least the buyer would give it his signature and bind himself to the purchase. This contract of sale is not signed by the vendees at all, and their assent is left to be supplied by inference from their action. In an ordinary sale the vendee becomes owner, and has the rights of an owner and may do what he pleases with his own; but this contract tells the owners what they shall do with the property bought, and how they shall hold it, and inferentially at least forbids its further sale or transfer. As a general rule the vendor fixes the value or price of the property which he sells, or sometimes submits the question to disinterested appraisers, but this contract of sale generously allows the value of the personal property, separate from the plant, to be appraised and fixed by five persons, all of whom are themselves among the purchasers.

These are general considerations which make one hesitate over the theory of a sale as distinguished from a trust, but the doubt increases as we come closer to the details of the agreement and scrutinize its exact terms.

It is observable that the selected transferee of the stock of the corporations was denominated simply a "board." That implied agency, a committee of managers, official servants

charged with executive duties and acting for and in the interest of others. The idea of a joint-stock association, capable of buying and acting as purchaser, had not yet dawned. Explicitly the deed declares "the shares of the capital stock of the several corporations to be transferred to the board as herein provided shall be transferred to the names of the board *as trustees,* to be held by them and by their successors as members of the board strictly as joint tenants." If beyond the inference of agency, suggested by the name and description of the board, more was needed to indicate the real aim and intention, it is supplied by the frank declaration that the transferees shall take as trustees, and hold in joint tenancy, which is the characteristic manner of a trust.

Other clauses in the instrument point significantly to the same construction. The purchase of stock in a corporation makes the buyer a stockholder. No such purchaser would think for a moment of requiring from the corporation a stipulation that he should have the rights of a stockholder, for those rights attach at once by force of his ownership. Yet we find in the document under examination, following the provision which requires the board to take as trustees, a clause entirely superfluous if a sale was meant, but a reasonable stipulation if a trust was intended, that "the board shall hold the stock transferred to it with all the rights and powers incident to stockholders in the several corporations." The clause carries with it a distinct suggestion that no absolute sale was intended, but a transfer in trust which might leave the assignors who became the beneficiaries some equitable right over the voting power, and to make sure of the vesting of that right in the trustees a specific and broad covenant was adopted adequate for all emergencies.

The owners of corporate stock, by force of their ownership, may put a mortgage upon the corporate property when the statute permits. Nobody doubts that, and no buyer would demand that permission of the seller. But the contract in question explicitly authorizes the board to raise money by mortgages upon the property of the corporations. It strikes

one as odd to see an absolute purchaser requiring his vendor in the deed of conveyance to covenant that the grantee may be at liberty to incumber by mortgage his own property. The astute pen which framed the deed of association had a very different aim, and realized that trustees, holding for trust purposes, should have power to mortgage given them if that necessity was contemplated.

A vendor about to sell his property, and to a very large amount, naturally looks carefully to his pay. A merchant or manufacturer who should sell his wares to a corporation having no other capital than the exact property bought, and take his pay in the stock of such corporation would scarcely be deemed sane in business circles. The board organized by the refineries had a nominal capital of fifty millions, but not a single dollar of actual capital beyond the corporate shares transferred; and so the sellers, if indeed, they were such, got aliquot parts of their own property in payment for the transfer. If they sold it, they simply got it back under a new name and, as we shall see, heavily watered, and with its care and management entrusted to others, under an arrangement which might or might not add to its earning power.

If in truth, the board was meant to be anything more than a trustee or manager of the combined corporations, if it was contemplated that it should become and be a joint-stock association at all, it was put by the very articles of its creation under the most singular and oppressive restrictions. What shall we say of a joint-stock association without a dollar of actual capital, and yet, forbidden to incur the least debt or obligation? It was commanded that "no action be taken by the board which shall create liability by it or by its members." Without a dollar it could not borrow a dollar; without money it could incur no debt; its cash resources were to come from a sale of its own certificates reserved over and above those allotted, or from mortgages made by the separate corporations, and yet this curious creation, viewed as a joint-stock association, was able to induce the sale to it of twenty corporations. The stockholders with astonishing generosity sold and trans-

ferred to it all their stock, allowed it to pocket fifteen per cent of its agreed value, and took aliquot parts of the remainder of their own property for their pay. It seems to me that the theory of an absolute sale involves us in difficulties and complications on almost every page of the deed or combination agreement, and that it is an after-thought framed under pressure and mismatching the entire tenor and terms of the instrument which it was invented to sustain. Indeed, I notice, among the briefs submitted to our study, a reprint of an article from a distinguished pen which traces the origin and history of economic combinations and monopolies, and ends with a determined defense of the one under review, but concedes it to be a trust, created by contract, and organized and existing as such.

The combination, therefore, framed by the deed was a trust; and, if created by the corporations, or in any respect the consequence or product of their action, some inevitable results would be certain to follow. But here we encounter the stronghold of the appellant's argument which is, that if the corporations are in some manner in the combination, they are there solely as the result of a contract other than their own; are there without corporate action on their part; and so are sufferers and not sinners. The reasoning leading to that result is so severely technical as to have suggested a justification almost reminding one of an apology. We are called upon to sever the corporation, the abstract legal entity, from the living and acting corporators; as it were, to separate in our thought the soul from the body, and admitting the sins of the latter to adjudge that the former remains pure. Let us first recall the facts in the order of their occurrence.

On the 22d day of April, 1887, there was a meeting of defendant's stockholders at which all the trustees were present. At that meeting the following preamble and resolutions were adopted by a unanimous vote :

" Whereas, It is contemplated that the several sugar refineries in New York and other cities shall consolidate their several refineries in one large concern or company; and

"Whereas, We deem it for the interest of the North River Sugar Refining Company to participate in the above said consolidation; therefore be it

"*Resolved*, That Peter Moller, Jr., George H. Moller and Gerd Martens be, and they are hereby, appointed a committee to make arrangements to perfect the said consolidation in behalf of the North River Sugar Refining Company with full power to act and to sign all contracts and agreements in the name of the said North River Sugar Refining Company, of whatever name or nature, concerning the said consolidation.

"*Resolved*, That we authorize the president and secretary of the North River Sugar Refining Company to sign all contracts, agreements and papers which the above-named committee may make in relation to the said consolidation."

In September following the secretary of the corporation added its signature to the deed. He tells us under oath, "I made that signature by virtue of authority from the stockholders and the board of officers of the North River Sugar Refining Company, the stockholders and trustees." It follows that the committee to whom authority was given to make the agreement, had made it. The stockholders by a unanimous vote decided to go into the proposed combination, and authorized their committee to agree on the terms. A trust of personal property may be created by parol. That the committee acted, that they contracted for their company upon the terms of the deed, is an inevitable inference from the action of the secretary, who swears that he signed by authority, and could have had none except upon the agreement of the committee. It was, therefore, actually made, and the official signature was but the evidence of the agreement entered into by them. Here was a deliberate corporate act, if stockholders and trustees united can ever perform one, attested by one of the two officers who were authorized to sign. At that moment the defendant company had become a party to the contract by the consent of everybody connected with the corporation, and by force of the agreement to that effect which the signature of the secretary shows had been made by the authorized agency.

But it is said the corporation repented and withdrew from the agreement. I do not stop to discuss the question whether they could revoke without the consent of the board and their associates in the trust deed, for assuming that they could, I prefer to analyze their revocation and see the scope and range of their repentance. The corporation remained a contracting creator of the trust until November 4, 1887. By the deed, the trust took effect on October first of that year, so that the defendant in its full corporate character became a party to it according to the terms of the deed, and remained bound by it for at least one month. But then there *did* come either repentance or fear. In November the stockholders again assembled and passed the resolution which is relied upon as a revocation. Its preamble recites a series of denials that the committee had made any agreement or that the president and secretary had signed any, and then, after declaring "it is deemed inexpedient *at the present time* to enter into any such consolidation," they revoked the powers conferred and the resolutions conferring them. That is to say, after the powers had been executed and had put the corporation into the com, bination, and it had become a constituent element of the trust, those powers were revoked upon a false assertion that they remained executory and so their revocation could be effective. I say a false assertion, for we are not at liberty to believe that George H. Moller, who was secretary of the corporation and one of the very committee authorized to make the agreement of consolidation, signed the deed when he knew that the committee had not agreed, and so in violation of his duty and without authority, and then positively swore that he signed by authority of the stockholders and trustees. His act and his oath heavily outweigh the resolutions of repentance. Let us not fail to observe that no signature is withdrawn, no notice is served upon the board or the associates, no consent of theirs asked or demanded, but the parties of one part to a contract come together and pass a resolution that they have not contracted and do not mean to, and rely upon that as releasing them from their obligation. All that they effectively

did was to raise a question of veracity which must be decided
against them upon the act and the oath of their own officer.

That repentance proved to be only a prelude to the exact
sin claimed to have been avoided. On the 25th of November,
1887, which was just three weeks after the resolutions of revo-
cation, the stockholders of the defendant company formally
resolved to sell their capital stock for $325,000 to John E.
Searles, Jr. It is not unworthy of notice that the resolution
to sell is prefaced by a recital that their secretary had signed
a deed of consolidation "under the belief that he was author-
ized so to do," a matter which had nothing to do with the new
agreement to sell unless the purpose of that agreement lay
beneath the surface. The committee to deliver the stocks
consisted of the same three persons who had originally been
authorized to make the agreement of consolidation which
had already been signed by Searles as treasurer of the
Havemeyer Sugar Refining Company. The stock was deliv-
ered to him, the price paid to the stockholders, and so
Searles became the one sole and only stockholder of the
defendant company. He and the "legal entity" alone survived,
and the latter apparently in a state of suspended animation.
An effort was made to ascertain from what source the pur-
chase-money came, but was not altogether successful. Searles
did not furnish it. A certain committee of three did, who
were to transfer the stock to the board. Searles adds:
"Those three gentlemen whom I have named as trustees of
*certain funds* paid for the stock; fund received by them for
*mortgages* and other matters connected with the organization.
Q. What organization? A. The Sugar Refineries Company,
the board." Well, the board got the stock from Searles, sole
owner and sole stockholder, and gave in exchange certificates
for $700,000, or a little more than double the purchase-price,
and which indicates the amount of water in the board's capital
stock. From that, however, was deducted the fifteen per cent
retained by the combination. What Searles did with the cer-
tificates, we do not know, nor is it important to ascertain.
We do know that new directors were chosen by the vote of

the board ; that Searles became president of the corporation ;
that its share of the regular dividend has been allotted to it for
its certificate holders, and that it has wholly ceased to refine
sugar.   And thus its baptism in the pool of the board became
complete and final.

And yet it is argued that the corporation, the legal entity,
has done nothing ; that Searles was guilty, but the corporate
robe that enveloped him was innocent, and so he must be left
to wear it undisturbed ; that while all that was human and
could act had sinned, yet the impalpable entity had not acted
at all and must go free.   I believe that the history of what
occurred, as I have already described it, furnishes a sufficient
answer, assuming that stockholders and trustees acting together
can do a corporate act at all.   There *was* corporate action in
making the combination agreement which bound the defendant.
The revocation of an executed authority left the contract
standing.   The corporation thus helped to make the trust and
became an element of it.   If there was anything imperfect in
its action, the new stockholder and his associates waived the
imperfection by acting upon the agreement of the corporation,
and so confirming it in all particulars.

But the assumption underlying the view I have expressed
is itself contested, and a proposition asserted which denies the
possibility of any corporate action, except by the trustees or
directors acting formally as such ; a proposition which, if
sound, dominates the whole field of controversy, and, estab-
lishing that there has been no corporate action at all, effectually
shuts out every question of illegality or public injury.   I can-
not admit that proposition.   I think there may be actual cor-
porate conduct which is not formal corporate action ; and
where that conduct is directed or produced by the whole body,
both of officers and stockholders, by every living instru-
mentality which can possess and wield the corporate franchise,
that conduct is of a corporate character, and if illegal and
injurious may deserve and receive the penalty of dissolution.
There always is, and there always must be, corporate conduct
without formal corporate action where the thing challenged is

an omission to act at all. A corporation organized in the public interest, with a view to the public welfare, and in the expectation of benefit to the community, which is the motive of the State's grant, may accept the franchise and hold it in sullen silence, doing nothing, resolving nothing, furnishing no formal corporate action upon which the State can put its finger and say, this the corporation has done by the agency through which it is authorized to act. That is corporate conduct which the State may question and punish without searching for a formal corporate act. The directors of a corporation, its authorized and active agency, may see the stockholders perverting its normal purposes by handing it over, bound and helpless, to an irresponsible and foreign authority, and omit all action which they ought to take, offer no resistance, make no protest, but silently acquiesce as directors in the wrong which as stockholders they have themselves helped to commit. That again is corporate conduct, though there be an utter absence of directors' resolutions. Is it asked what they could have done to prevent the organization of the trust; how they were negligent and unfaithful as corporate officers by their omission to act; what good a mere protest or objection would have accomplished; what effective form their resistance could have assumed? The answer is that they could have refused to recognize the illegal trust transfer of the stock; they could have declined to register the new ownership upon their stock-books; they could have said, and acted upon their words, that the original stockholders remained not only the beneficial, but the legal owners of the stock; and, if the board trustees appealed to the law, the resisting directors could challenge the legality of the transfer as moulded by the combination agreement, and might have defeated the trust and shattered it at the outset of its career. So much they could have done as corporate officers; so much it was their duty to have done as representatives of the corporation; and when, beyond that corporate neglect, they recognized the validity of the stock transfers in trust, put the new and unlawful ownership upon their books, and accepted its votes in the choice of new

directors who were to throttle the independence of the corporation and chain it to the will of the trust, I think we must shut our eyes in willful blindness if we fail to see both corporate neglect and corporate action.

It is true, as we are reminded, that the statute confers upon trustees and directors general authority to manage the stock, property and concerns of manufacturing corporations; and equally true that, as a general rule and as between the companies and those with whom they deal, the corporate action must be manifested through and by the directors; but other statutes indicate with equal plainness that there are corporate acts which the trustees cannot perform, and which affect and bind the corporation only upon the condition that they proceed from the stockholders, or from them and the trustees acting together. In increasing or diminishing the capital stock, the corporate act is wholly that of the corporators, and in consolidating two or more companies into one, there must be the joint action of both trustees and stockholders. The trust of the refineries, in substance and effect, approached very near to these two corporate acts, so far as the resultant consequences affected the corporators acting. The trust stipulations practically doubled their corporate stock through the agency of the certificates issued, and the combination in its result is largely the equivalent of a substantial consolidation. If these things had been done lawfully, they would have been accomplished by the united action of trustees and corporators, and beyond any question would have been corporate acts. Having been done unlawfully, but by the same united agency aiming at similar results, they must still constitute corporate conduct, unless the bare fact of their illegality takes away their corporate character. To say that, would disarm the state in every case of misuse or abuse of chartered powers.

The abstract idea of a corporation, the legal entity, the impalpable and intangible creation of human thought is itself a fiction, and has been appropriately described as a figure of speech. It serves very well to designate in our minds the collective action and agency of many individuals as permitted

by the law; and the substantial inquiry always is what in a given case has been that collective action and agency. As between the corporation and those with whom it deals, the manner of its exercise usually is material, but as between it and the State, the substantial inquiry is only what that collective action and agency has done, what it has, in fact, accomplished, what is seen to be its effective work, what has been its conduct. It ought not to be otherwise. The State gave the franchise, the charter, not to the impalpable, intangible and almost nebulous fiction of our thought, but to the corporators, the individuals, the acting and living men, to be used by them, to redound to their benefit, to strengthen their hands and add energy to their capital. If it is taken away, it is taken from them as individuals and corporators, and the legal fiction disappears. The benefit is theirs, the punishment is theirs, and both must attend and depend upon their conduct; and when they all act, collectively, as an aggregate body, without the least exception, and so acting, reach results and accomplish purposes clearly corporate in their character, and affecting the vitality, the independence, the utility, of the corporation itself, we cannot hesitate to conclude that there has been corporate conduct which the state may review, and not be defeated by the assumed innocence of a convenient fiction. As was said in *People ex rel.* v. *K. & M. T. R. Co.* (23 Wend. 193), " though the proceeding by information be against the corporate body, it is the acts or omissions of the individual corporators that are the subject of the judgment of the court."

It remains to determine whether the conduct of the defendant in participating in the creation of the trust, and becoming an element of it was illegal and tended to the public injury and we may consider the two questions together and without formal separation.

It is quite clear that the effect of the defendant's action was to divest itself of the essential and vital elements of its franchise by placing them in trust; to accept from the State the gift of corporate life only to disregard the conditions upon

which it was given ; to receive its powers and privileges merely to put them in pawn ; and to give away to an irresponsible board its entire independence and self-control.   When it had passed into the hands of the trust, only a shell of a corpora- tion was left standing, as a seeming obedience to the law, but with its internal structure destroyed or removed.   Its stock- holders, retaining their beneficial interest, have separated from it their voting power, and so parted with the control which the charter gave them and the State required them to exercise. It has a board of directors nominally and formally in office, but qualified by shares which they do not own, and owing their official life to the board which can end their power at any moment of disobedience.   It can make no dividends whatever may be its net earnings, and must encumber its property at the command of its master, and for purposes wholly foreign to its own corporate interests and duties.   At the command of that master it has ceased to refine sugar, and without any doubt for the purpose of so far lessening the market supply as to prevent what is termed " over production." In all these respects it has wasted and perverted the privileges conferred by the charter, abused its powers, and proved unfaith- ful to its duties.   But graver still is the illegal action substi- tuted for the conduct which the State had a right to expect and require.   It has helped to create an anomalous trust which is, in substance and effect, a partnership of twenty separate corporations.   The State permits in many ways an aggregation of capital, but mindful of the possible dangers to the people, over-balancing the benefits, keeps upon it a restraining hand, and maintains over it a prudent supervision, where such aggre- gation depends upon its permission and grows out of its cor- porate grants.   It is a violation of law for corporations to enter into a partnership.   (*N. Y. & S. C. Co.* v. *F. Bank,* 7 Wend. 412 ; *Clearwater* v. *Meredith,* 1 Wall. 29 ; *Whittenton Mills* v. *Upton,* 10 Gray, 596.)   The case last cited furnishes the reasons with precision and at length.   It shows the utter inconsistency of a double allegiance by those who act for the corporation to two different principals, and demonstrates that

the vital characteristics of the corporation are of necessity drowned in the paramount authority of the partnership. That the combination of the refineries partakes of the nature of a partnership is not denied. Indeed, in one of the papers added to the appellant's brief, it is not only admitted but asserted and defended. That paper shows quite clearly, that by force of the arrangement, there was a community of interest in the fund created by the corporate earnings before division, and that each member of the trust shared in the profit and loss of all. It is said, however, that a consolidation of manufacturing corporations is permitted by the law, and that the trust or combination or partnership, however it may be described, amounts only to a practical consolidation which public policy does not forbid because the statute permits it. (Laws of 1867, chap. 960 ; Laws of 1884, chap. 367.) The refineries did not avail themselves of that statute. They chose to disregard it, and to reach its practical results without subjection to the prudential restraints with which the State accompanied its permission. If there had been a consolidation under the statute, one single corporation would have taken the place of the others dissolved. They would have disappeared utterly, and not, as under the trust, remained in apparent existence to threaten and menace other organizations and occupy the ground which otherwise would be left free. Under the statute the resultant combination would itself be a corporation deriving its existence from the State, owing duties and obligations to the State, and subject to the control and supervision of the State, and not, as here, an unincorporated board, a colossal and gigantic partnership, having no corporate functions and owing no corporate allegiance. Under the statute the consolidated company taking the place of the separate corporations could have as capital stock only an amount equal to the fair aggregate value of the rights and franchises of the companies absorbed ; and not as here a capital stock double that value at the outset and capable of an elastic and irresponsible increase. The difference is very great and serves further to indicate the inherent illegality of the trust combination.

And here I think we gain a definite view of the injurious tendencies developed by its organization and operation, and of the public interests which are menaced by its action. As corporate grants are always assumed to have been made for the public benefit, any conduct which destroys their normal functions, and maims and cripples their separate activity, and takes away their free and independent action, must so far disappoint the purpose of their creation as to affect unfavorably the public interest; and that to a much greater extent when beyond their own several aggregations of capital they compact them all into one combination which stands outside of the ward of the State, which dominates the range of an entire industry, and puts upon the market a capital stock proudly defiant of actual values, and capable of an unlimited expansion. It is not a sufficient answer to say that similar results may be lawfully accomplished; that an individual having the necessary wealth might have bought all these refineries, manned them with his own chosen agents, and managed them as a group at his sovereign will; for it is one thing for the State to respect the rights of ownership and protect them out of regard to the business freedom of the citizen, and quite another thing to add to that possibility a further extension of those consequences by creating artificial persons to aid in producing such aggregations. The individuals are few who hold in possession such enormous wealth, and fewer still who peril it all in a manufacturing enterprise; but if corporations can combine, and mass their forces in a solid trust or partnership, with little added risk to the capital already embarked, without limit to the magnitude of the aggregation, a tempting and easy road is opened to enormous combinations, vastly exceeding in number and in strength and in their power over industry any possibilities of individual ownership; and the State by the creation of the artifical persons constituting the elements of the combination, and failing to limit and restrain their powers, becomes itself the responsible creator, the voluntary cause of an aggregation of capital which it simply endures in the individual as the product of his free agency. What it may bear is one thing, what it should cause and create is quite another.

And so we have reached our conclusion, and it appears to us to have been established, that the defendant corporation has violated its charter and failed in the performance of its corporate duties, and that in respects so material and important as to justify a judgment of dissolution. Having reached that result, it becomes needless to advance into the wider discussion over monopolies and competition and restraint of trade and the problems of political economy. Our duty is to leave them until some proper emergency compels their consideration. Without either approval or disapproval of the views expressed upon that branch of the case by the courts below, we are enabled to decide that in this State there can be no partnerships of separate and independent corporations, whether directly, or indirectly through the medium of a trust; no substantial consolidations which avoid and disregard the statutory permissions and restraints, but that manufacturing corporations must be and remain several as they were created, or one under the statute.

The judgment appealed from should be affirmed with costs.

All concur.

Judgment affirmed.