Davis, J.
The attorney general makes his contention for ousting the defendant from the privilege of doing business in Ohio, on the provisions of certain contracts, or debentures, denominated by the defendant company “Accumulative Endowment Certificates,” distinguished as series A, series B, series C, and series D. It is claimed that the defendant has misused its corporate franchises and privileges in issuing these debentures, because they are upon the face of them, in contravention of law. It is insisted on the part of the relator, that some, at least, of these debentures are vitiated by containing elements of chance and prize so as to constitute a lottery scheme, and that all of them are calculated to deceive and defraud an unsuspecting public. The question here is not whether the promoters of the defendant company have intentionally devised a scheme to mislead and defraud; but whether that is the effect of it. The promoters and the investors may be self-deluded, or satisfied to take the chances offered; but that does not alter the character of the scheme. If the company is misusing its corporate privileges in such way as fo be a public abuse, the writ must issue regardless of the intent. Nor are we now called upon to draw the line of demarcation between such insurance and investment methods as have been approved by the law and the schemes now under consideration. We are *318 not considering life insurance methods, tontine or other, building and loan associations, or investment companies in general. We are only concerned with the question whether the methods of this company are lawful or not. In this connection we recur to the averment in the answer to the effect that the defendant has literally complied with the requirements of an act of the legislature of Ohio “to regulate certificate bond and investment companies, partnerships and associations, other than building and loan companies, and to regulate investment guaranty eompanies, partnerships and associations doing business on the service dividend plan, and to protect holders of their certificates, debentures and securities,” and that the defendant has received from the secretary of state the certificates authorized by that act. If this averment was inserted in the answer with the understanding that compliance with the statue referred to legalized the financial schemes now under consideration, it is based on an erroneous theory. The legislature is presumed to have contemplated that a corporation thus authorized to do business in this state would exercise its franchises within chartered limits, and in a manner not injurious to the public. Leslie v. Lorillard, 110 N. Y., 531; People v. North River Sugar Refining Co., 121 N. Y., 582. This law was enacted expressly to regulate bond and investment companies and to protect the holders of their certificates. The legislature could not, and did not assume to, exercise judicial power by declaring that acts or contracts of such companies, which are inherently immoral and. prejudicial to the public welfare or unconstitutional should be lawful. Nor did the legislature undertake to declare public policy in regard to bond and investment companies further than that *319 they should be regulated and that the holders of their securities should be in some measure protected.
It would serve no good purpose to detail the processes by which we have reached our conclusions after having carefully considered all of the elaborate arguments which have been submitted.
An inspection of the different classes of “accumulative endowment certificates” issued by the defendant, discloses that in none of them does a certificate absolutely and certainly mature within any fixed and definite period; yet the certificates are all so drawn as to create the expectation, and to make it appear, that they wall mature in a period of one hundred and twenty months. With all the light which we have received from counsel and other sources, we have been unable to persuade ourselves that the credit, to any of these classes of certificates, in the reserve fund, or in the reserve and tontine funds, will equal the endowment val ue within the stipulated periods, without the aid of lapses or the apportionment of funds derived from new business. Indeed it is almost self-evident that with seventy-five or eighty per cent, of the premiums received consumed in expenses and monthly redemptions, the reserve credits could not equal the endowment value in several times the periods stipulated. In other words, twenty or twenty-five per cent. of. the premiums, with its interest earnings, alone and unaided by lapses or the appropriation of money from premiums received for new business, will not sufficiently accumulate to equal the represented endowment value in the stipulated periods. A little calculation applied to the representations in any of these tables of values will demonstrate this proposition. If this deficiency in the reserve should be made up by appropriating premiums received on new business, it is ob *320 vious that in redeeming the old obligations new and greater ones are created, making the possibility of ultimate redemption of all the obligations still more problematical. But if the deficiency should be made up by lapses or forfeitures, it is equally clear that the lapses must be very numerous, so numerous in fact as to eventually destroy the credit of the company and bring ruin upon it. A scheme which can succeed only by lapses is manifestly a scheme which will enrich some at the expense of others who embark in the same enterprise. It holds out the inducement that those who may be strong enough to survive will find their profit in the weakness, the misfortunes and the discouragements which cause a larger number of their associates to fall by the way. Moreover, since the salvation of the company depends on these lapses, it necessarily tends to encourage and produce them. True enough, all of these certificates are non-forfeit-able after thirty-six monthly payments; but that only signifies that a larger number must fail in the first three years or that the whole scheme must fail, for the vice of the plan is, not that some may fail, but that many must fail in order that all continuing certificates shall mature. Formerly the profits from this source to life insurance companies were. understood to be very large and public attention being drawn to it, in many of the states laws regulating the non-forfeiture of policies were enacted; and such has been the force of public opinion, and public policy as expressed in these statutes, that it is believed that no standard company can be found which counts upon lapses as a necessary element in determining its ability to carry out its contracts; and all such companies so calculate as to carry out *321 their contracts even should no lapses occur, except perhaps in some forms of tontine insurance. Indeed there is no fixed rate or percentage of lapses Avhich can be used as a basis of calculation. The percentage of lapses varies Avith different companies, and at different times Avith the same company. Shall this fallacious and uncertain element, which has thus been in so large a measure eliminated from legitimate business methods, be encouraged to reappear and to delude the inexperienced and the unwary? We cannot conceive it to be our duty to lend such encouragement.
But wherein is the chief attraction held out to the public by the defendant? In series A the certificates, or rather some of them, are liable to be matured fortuitously at periods more or less extended from the time of their issue. This is done by taking a percentage of the total number of contracts in force each month. This percentage, it must be observed, Avill be as Available and uncertain as the contingencies of business will make it. The numeral being thus determined the certificates are arbitrarily matured by beginning the count “with the oldest certificate in force (after the surrender and special redemptions have been made for the month) and continued through as many live certificates as the numeral indicates, the last one counted being the one called in for payment. Proceeding to count in like manner from the certificates so called in, the second one to be paid is reached; this method is continued until the sum of all the values of the certificates thus called in equals the amount in the regular redemption fund.” Turning now to the table of values in series A, we find that if a certificate is so redeemed at the end of twelve *322 months the holder will receive $4.00 more than he has paid, that is 66 2-3 per cent, per annum simple interest on his investment for an average of six months, If a certificate should be redeemed at the end of twenty-four months the holder’s profit would still be 66 2-3 per cent, per annum upon his investment for an average of twelve months. If a certificate should be redeemed at the end of thirty-six months the holder’s profit would still be 66 2-3 per cent, per annum upon his investment for an average of eighteen months. From this point, the point at which the certificates become non-forfeitable, the percentage of profit decreases until at the one hundred and twentieth month it has gone down to 20 per cent, per annum simple interest on an investment of $120.00 for an average of five years. The rate of profit being unequal, the prize in this scheme is a large profit and quick return to the fortunate holder of a certificate selected for redemption, and the gaming chance is that his certificate will be called in for early redemption by the “numeral-apart” system of selection. Yet in face of all this counsel ask: “How can a scheme be a lottery in which there are no blanks and all investors for the payment of the same sums receive the same prize?” The blanks are all the numbers included in the extent of the “numeral-apart,” except the last one, which draws a prize, and the prize is pointed out above. Our conclusion is that series A is a lottery and unlawful, and that none of the schemes of defendant, as shown in certificates of series A, B, C and D will legitimately “finance out,” as represented. It follows that the demurrer to the answer should be sustained and that the prayer of the relator should be granted.
*323 It should be added as the opinion of the whole court that it is the duty of the state treasurer to hold and distribute the fund deposited with him," in trust for the holders of the debentures in this state, according to the amount that may be found due to each one.

'Judgment of ouster.

Minshall, G. J., Williams, Bürket and Spear, JJ., concur.